UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RAVAGO AMERICAS LLC,
a Delaware limited liability company,

       Plaintiff,                        CASE NO. _____

v.

JOHN WARD, an individual,

       Defendant.

_____

## VERIFIED COMPLAINT

      Plaintiff Ravago Americas LLC ("Ravago") brings this action against Defendant John Ward under Ohio law, the Defend Trade Secrets Act, and Florida law. Ward is a former Ravago employee who recently left Ravago to work with other former Ravago employees in a start-up division of a direct competitor; competing directly with Ravago's resale business. Before leaving, though, Ward had multiple communications with other departing employees and wrongfully removed the hard drive from his Ravago-issued computer, replacing it with a functionally unusable hard drive. Now, with his new employer, Ward is misappropriating Ravago's confidential information and trade secrets, and is violating his contractual obligations to Ravago, which are governed under Ohio law. Thus, Ravago seeks injunctive relief precluding Ward from using the confidential and trade secret information he misappropriated, and compensatory, exemplary, and punitive damages as may be allowed by law.

# PARTIES

**Plaintiff Ravago**

1.     Ravago is a Delaware limited liability company with its headquarters at 1900 Summit Tower Boulevard, Suite 900, Orlando, Florida 32810.

2.     Ravago distributes, resells, and compounds plastic and rubber materials purchased from its suppliers, ranging from high performance, engineered resins to recycled, post-consumer materials.

3.     Ravago operates resale, distribution, manufacturing, and logistics businesses and operates through various divisions.

4.     One of those divisions is Muehlstein, which is a reseller and distributor of resin products. Muehlstein became a division of Ravago when Ravago acquired Muehlstein in 2006.

5.     Ravago's business involves high volumes and narrow profit margins. Product availability, pricing, and personal relationships are very important to its overall success.

6.     Ravago is a privately held company. Ravago does not share its financial information and other business information with the public.

**Defendant Ward**

7.     Ward is a former employee of Ravago in its Muehlstein division.

8.     Ward resides in Medina County, Ohio. At all times during his employment, Ward lived in Ohio, and Ravago's headquarters were in Florida.

9.     In 1995, Ward began his employment with Muehlstein as a Distribution Coordinator in Toronto, Canada. He was promoted in 2000 to Product Manager of Polypropylene and relocated to the United States to support Muehlstein's sales efforts in new account development in Canada, the Midwest, and the West Coast.

10.     On June 10, 2005, Ward executed a Non-Solicitation and Confidentiality Agreement ("Agreement").

11.     A true and correct copy of Ward's Agreement is attached hereto and incorporated herein as Exhibit A.

12.     Ward thereafter received a series of promotions and held positions as the Regional Manager of Ravago Canada in the Resale division, Product Manager, Sales Manager in Molding Polyethylene, and Regional Manager of Canada Resale.

13.     In 2013, Ward was promoted to Market Manager for the Midwest and West Coast, where he directly managed key clients of Ravago.

14.     While at senior management meetings in Orlando, Florida, Ward was given access to Ravago's confidential business strategy, financials, customer and supply targets, and pricing strategy.

15.     On September 14, 2018, Ward resigned from Ravago.

16.     On September 17, 2018, Ward joined Vinmar Polymers America, LLC ("VPA") as Business Director, Polypropylene & Polyethylene Durables.

17.     VPA is an affiliate of Vinmar International, Ltd. ("Vinmar"), a direct competitor of Ravago.

18.     Prior to resigning from Ravago and returning his company-issued computer, Ward removed the original hard drive from that computer, replacing it with a different hard drive so that there were no usable files remaining.

**OTHER KEY PLAYERS**

19.     Kirt Dmytruk is a former Ravago employee who too recently left Ravago to launch VPA. Upon information and belief, Ward now reports to Dmytruk.

20.     Hermant Goradia ("H. Goradia") is Vinmar's President.

21.    H. Goradia is a manager of VPA.

22.    Vishal Goradia ("V. Goradia") is Vinmar's Senior Vice President. As Senior Vice President for Vinmar, V. Goradia has responsibility for Plastics, Plastics Supply Chain, and Specialty Chemicals distribution for Vinmar.

23.    V. Goradia is a manager of VPA.

24.    Kevin Page is Vice President of Vinmar. In this capacity, Page engaged in multiple communications with Ravago employees, including upon information and belief, Ward, before September 2018.

25.    Tom Cassel is a Director in human resources at Vinmar.

26.    In his capacity as a Director for Vinmar, since September 2018, Cassel has attempted to recruit multiple Ravago employees to work for Vinmar or VPA. Upon information and belief, Cassel obtained information to recruit these individuals from Ward.

27.    Jeff Siebenaller is a former employee of Ravago, who retired from the company in July 2018.

28.    Siebenaller and Ward had frequent communications while employed by Ravago and upon information and belief, Siebenaller and Dmytruk communicated with Ward about leaving Ravago and joining VPA.

29.    After Siebenaller left Ravago, he joined VPA as a consultant, commencing on September 4, 2018. Upon information and belief, Siebenaller reports to Dmytruk now.

30.    Daniel Peretz is a former employee of Ravago Canada Co.

31.    Ravago Canada Co. is an affiliate of the Plaintiff here.

32.     On October 9, 2018, Peretz resigned from Ravago. He informed management that he was going to work for the Vinmar Group. While at Ravago, Peretz reported to Ward. Peretz and Ward had a close working relationship at Ravago.

33.     Upon his departure, Peretz took 80 confidential Ravago files. Litigation is ongoing in Canada as a result.

34.     Peretz uploaded Ravago confidential information to an unauthorized iCloud account.

35.     Following his joining Vinmar, Peretz contacted Plaintiff's employees, soliciting them for employment for VPA. Upon information and belief, Peretz coordinated the solicitation for these employees with Ward and perhaps others.

### JURISDICTION AND VENUE

36.     This Court has federal question jurisdiction over this matter, pursuant to 28 U.S.C. § 1331, because Ravago asserts claims against Ward under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(c), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

37.     This Court has supplemental jurisdiction over Ravago's remaining state law claims, pursuant to 28 U.S.C. § 1367.

38.     This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Ravago's sole member is a Delaware corporation. Ravago is a citizen of Delaware and Florida under 28 U.S.C. § 1332(c). Ward is a citizen of Ohio.

39.     Ward's Agreement provides for Ohio law to apply:

> The parties agree that this Agreement is to be governed by and construed under Ohio law. [Ravago] and the Employee further acknowledge and agree that this Agreement is intended, among other things, to supplement, as applicable, the common law of trade secrets and/or the provisions of the Uniform Trade Secrets Act, as amended from time to time, and the duties the Employee owes to

[Ravago] under the common law, including but not limited to, the duty of loyalty, and does not in any way abrogate any of the obligations or duties the Employee otherwise owes to Ravago.

(Ex. A § 17.)

40.  Ravago's claims against Ward include breach of contract by virtue of misappropriating confidential information and trade secrets, as well as statutory claims for misappropriation of trade secrets and tort claims for breach of fiduciary duty arising out of or related to his employment under Ohio law.

41.  Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), because Ward resides in Ohio, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

**Ward's Agreement**

42.  Ward's Agreement is an enforceable contract between him and "Muehlstein Administrative Services LLC, its successors and any of its current or future divisions, subsidiaries, affiliates or related organizations." (Ex. A at 1.)

43.  Ward specifically agreed as follows:

SUCCESSORS
This Agreement shall be binding upon and inure to the benefit of Muehlstein and its successors and assigns, and the Employee, his/her heirs, executors and administrators. Muehlstein shall have the right to assign this Agreement to a successor to all or substantially all of the business or assets of Muehlstein or any division or part of Muehlstein with which employee is employed at any time.

(Ex. A § 14.)

44.  Ward is bound by the Agreement.

45.  Ravago is entitled to enforce the Agreement against Ward. As a successor to Muehlstein Administrative Services LLC, the Agreement was assigned to Ravago when it acquired

Muehlstein, pursuant to Section 14 of the Agreement expressly authorizing the same. Muehlstein currently operates as a division of Ravago.

46.     In the Agreement, Ward agreed that Ravago, as successor to Muehlstein, is "engaged in the highly competitive business of distributing plastic and rubber raw materials and compounds." (Ex. A § 1.)

47.     In the Agreement, Ward agreed that Ravago, as successor to Muehlstein, expended "substantial amounts of money and the use of skills developed over a long period of time." (Ex. A. § 1.)

48.     In the Agreement, Ward agreed that Ravago, as successor to Muehlstein, "has developed and will continue to develop certain valuable trade secrets, confidential information and inventions that are peculiar to [its] business and the disclosure of which would cause [Ravago, as successor to Muehlstein,] great and irreparable harm." (Ex. A. § 1.)

49.     Ravago operates in a highly competitive market.

50.     Both pricing and personal relationships are very important to Ravago.

51.     Ward is a former employee who has specialized knowledge of Ravago's internal strategy, pricing structure, and customer relationships.

52.     The restrictions in the Agreement are reasonably tailored to protect Ravago's business.

53.     The restrictions in the Agreement are reasonable as to Ward, who was a trusted Ravago employee.

54.     The Agreement differentiates between "Trade Secrets" and "Confidential Information."

55.     The Agreement defines "Trade Secrets" as "any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to [Ravago's] competitors. To the fullest extent consistent with the foregoing, Trade Secrets shall

include, without limitation, all information and documentation, whether or not patented, copyrighted or trademarked, pertaining to the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning [Ravago's] products and services." (Ex. A § 1(a).)

56.     The Agreement defines "Confidential Information" as follows:

(b)     The term "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to [Ravago] and not generally known to the public, including but not limited to:

i)     **Product information**, including but not limited to designs, specifications, modifications, advancements and discoveries;

ii)     **Financial information**, including but not limited to earnings, assets, debts, prices, fee structures, volumes of purchases or sales, or other financial data, whether relating to [Ravago] generally, or to particular products, services, geographic areas, or time periods;

iii)     **Supply and service information**, including but not limited to information concerning the goods and services used or purchased by [Ravago], the names and addresses of suppliers, terms of supplier service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of particular suppliers, though generally known or available, yields advantages to [Ravago] the details of which are not generally known;

iv)     **Marketing information**, including but not limited to details about ongoing or proposed marketing programs or agreements by or on behalf of [Ravago], marketing forecasts, results of marketing efforts or information about impending transactions;

v)     **Personnel information**, including but not limited to employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hiring, resignations, disciplinary actions, terminations or reasons therefore, training methods, performance or other employee information;

vi)     **Customer information**, including but not limited to any compilations of past, existing or prospective customers, customer proposals or agreements between customers and [Ravago], status of customer accounts or credit, or related information about actual or prospective customers; and

vii) **Business information**, including but not limited to business plans, minutes of board meetings, financial reports, strategic plans, operations manuals and best practices memoranda.

(Ex. A § 1(b) (emphasis added).)

57.    Ward agreed that he would not,

while employed  by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret. The Employee further agrees, except as specifically required in the performance of his/her duties for [Ravago], that he/she will not, while employed by [Ravago] and for two (2) years after his/her employment has ceased, disclose or disseminate to any other person, organization or entity or otherwise employ any Confidential Information. Nothing in this paragraph shall preclude the employee from disclosing or using Trade Secrets or Confidential Information if (a) the Trade Secrets or Confidential Information have become generally known, at the time the Trade Secrets or Confidential Information are used or disclosed, to the public or to competitors of [Ravago] through no act or omission of the Employee or (b) the disclosure of the trade secrets or confidential information is required to be made by any law, regulation, governmental body or authority, or court order.

(Ex. A § 3.)

58.    Ward also agreed that he would return all company property, specifically:

The Employee agrees that he/she will deliver to [Ravago] upon the conclusion of his/her employment, and at any other time upon [Ravago's] request, all memoranda, notes, records, computers, computer programs, computer files, computer disks, drawings or other documentation, and all copies thereof, in his/her possession, custody or control, whether made or compiled by the Employee alone or with others or made available to him/her while employed by [Ravago]. The Employee further agrees to sign a statement verifying that he/she has returned all such property.

(Ex. A § 4.)

59.    Ward agreed to devote his efforts to working for Ravago:

The Employee agrees to devote his/her best efforts to the services of [Ravago] in such capacity as [Ravago] from time to time shall direct. The Employee further agrees that while employed by [Ravago] he/she will not have any direct or indirect financial interest in any entity reasonably deemed to compete with [Ravago] with the exception of shares in publicly-traded companies.

(Ex. A § 6.)

60.     Ward agreed not to solicit Ravago customers and suppliers:

NON-SOLICITATION OF CUSTOMERS & SUPPLIERS
(a)     The Employee agrees that while employed by [Ravago], he/she will
become intertwined with [Ravago]'s goodwill by having contact with and
becoming aware of some, most or all of [Ravago]'s customers, representatives of
those customers, suppliers, representatives of those suppliers, their names and
addresses, specific customer and supplier needs and requirements, and leads and
references to prospective customers. The Employee will also become privy to
[Ravago]'s trade secrets and confidential information. The Employee further
agrees that loss of such goodwill, trade secrets, confidential information,
customers and/or suppliers will cause [Ravago] great and irreparable harm.

(b)     The Employee agrees that for eighteen (18) months after the conclusion of
his/her employment he/she will not directly or indirectly solicit, contact, call
upon, communicate with or attempt to communicate with any customer, former
customer, prospective customer, supplier, former supplier or prospective supplier
of [Ravago] for the purpose of providing or obtaining any product or service
reasonably deemed competitive with any product or service then offered by
[Ravago]. This restriction shall apply only to:
    i)      any customer, former customer, prospective customer,
    supplier, former supplier or prospective supplier of [Ravago] with
    whom the Employee had contact during the last twelve months of
    his/her employment with [Ravago], or
    ii)     any customer, former customer, prospective customer,
    supplier, former supplier or prospective supplier of [Ravago] for
    which the Employee has obtained confidential information, as
    defined by this Agreement, during the last twelve months of
    his/her employment with [Ravago].

For the purposes of this paragraph, "contact" means interaction between the
Employee and the customer, former customer, prospective customer, supplier,
former supplier or prospective supplier which takes place to further the business
relationship, or performing services for the customer, former customer,
prospective customer, supplier, former supplier or prospective supplier on behalf
of [Ravago].

(Ex. A § 7.)

61.     Ward agreed not to solicit Ravago employees:

NON-SOLICITATION OF EMPLOYEES
The Employee agrees that while employed by Muehlstein and for eighteen
(18) months after the conclusion of his/her employment he/she will not

> directly or indirectly recruit, hire or attempt to recruit or hire any other employee of Muehlstein with whom the Employee had contact during his/her employment with Muehlstein. For the purposes of this paragraph, "contact" means any interaction whatsoever between the Employee and the other employee.

(Ex. A § 8.)

**Ward Conspires with Other Employees to Start VPA.**

62.     In 2018, Ward's mobile telephone number was 330-283-3215. During his employment with Ravago, Ward used this mobile telephone number on behalf of Ravago, and until January 2018, Ravago paid the costs of this phone.

63.     In 2017 and prior to August 7, 2018, Dmytruk's mobile telephone number was 770-331-1835. During his employment with Ravago, Dmytruk used this mobile telephone number on behalf of Ravago.

64.     Dmytruk spoke with Ward multiple times in the weeks prior to Dmytruk's resignation. Between June 8, 2018, and July 23, 2018, the telephone numbers assigned to Dmytruk and Ward shared 480 minutes of connectivity. Upon information and belief, Dmytruk and Ward were using these telephones to communicate. Upon information and belief, Dmytruk and Ward communicated during this time through means other than mobile telephone conversations, including text messages and e-mail.

65.     The extensive communications between Dmytruk and Ward were uncharacteristic. For the entire year of 2017 (January 12, 2017 to December 4, 2017), the same telephone numbers assigned to Dmytruk and Ward shared only 295 minutes of connectivity.

66.     A true and correct log of telephone calls between Dmytruk's and Ward's assigned telephone numbers between January 12, 2017 and July 23, 2018 is attached hereto and incorporated herein as Exhibit B.

67.     There was no legitimate Ravago-related business reason for extensive communications between Dmytruk and Ward between June 8, 2018 and July 23, 2018. Upon information and belief, Ward had no prior contact with Vinmar, and Dmytruk was soliciting and recruiting Ward to join Vinmar.

68.     On July 13, 2018, Siebenaller "retired" from Ravago.

69.     On August 7, 2018, Dmytruk resigned from Ravago.

70.     On August 12, 2018, just five days after his resignation from Ravago and ten days after VPA was formed, VPA publicly announced Dmytruk as the President of VPA, Vinmar's brand new polymer arm.

71.     Ravago's September 2018 telephone records show that Dmytruk, Ward, Siebenaller, and Vinmar contacted Ravago employees for purposes of soliciting those employees to work for Vinmar or VPA.

72.     A true and correct copy of the telephone records showing these communications between Dmytruk, Ward, Siebenaller, and Vinmar and Ravago employees is attached hereto and incorporated herein as Exhibit C.

**Ravago's Business**

73.     Ravago outperforms peer companies through highly confidential processes and systems in all three segments of the industry: suppliers, logistics, and customers.

74.     The "supplier" segment of the business involves Ravago purchasing a broad spectrum of resin grades from manufacturers (the suppliers), which Ravago needs for product to sell to end-user customers.

75.     Ravago's supplier sector is built upon its relationship with suppliers, which Ravago devotes significant time, money, and resources to develop. These critical supplier relationships result in confidential information, including but not limited to pricing, material, volume

commitments, logistics, and Ravago business models tailored to the commercialization of supplier products.

76.    Ravago takes steps to protect and hold aspects of its supplier business, such as the identities of its top suppliers, the volumes purchased, business models, pricing, and logistics from transferring the resin from the supplier to Ravago and then to the end user, as confidential.

77.    Ravago's supplier confidential information is entrusted to only a select group of individuals within the company and is not generally known in the market. Supplier information is maintained in a database and Excel spreadsheets. If a competitor had access to the confidential aspects of the supplier segment, including the information in the database or the Excel spreadsheets, a competitor could purchase the resin from the suppliers and deny the availability of resin to Ravago, which would limit its ability to sell resin to Ravago's customers.

78.    The logistics segment involves operations and businesses deployed by Ravago to transport and store products from the point of delivery from suppliers to delivery locations for customers.

79.    Ravago's logistics segment relies upon confidential information and trade secrets, which include pricing agreements with logistics providers in the warehousing, freight, trucking, and rail industries.

80.    Ravago's logistics segment includes confidential and trade secret information that is entrusted to only a select group of individuals within the company, is protected by non-disclosure agreements, and is not generally known in the market.

81.    The logistics involved in the supply chain are key to Ravago's business because it involves how Ravago contracts with trucking companies and manages delivery. If it were to lose truck capacity to a competitor, Ravago would lose business.

82.     The customer segment of the Ravago business is the channel it uses to sell products to customers.

83.     Ravago's customer segment is based upon unique pricing, financing, and credit strategies, as well as confidential and trade secret customer lists.

84.     Ravago's customer information and strategies are entrusted to only a select group of individuals within the company and are not generally known in the market.

85.     During his employment with Ravago, Ward had direct access to the Ravago confidential information relating to the supplier, logistics, and customer segments of Ravago's business.

86.     During his employment with Ravago, Ward had direct access to the Ravago trade secrets relating to the supplier, logistics, and customer segments of Ravago's business.

**Ravago Confidential Information**

87.     In the Agreement, Ward acknowledged that the following types of Ravago information are confidential: product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information ("Ravago Confidential Information").

88.     In the Agreement, Ward promised not to disclose Ravago Confidential Information.

89.     During his employment with Ravago, Ward had access to Ravago Confidential Information, namely its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information.

90.     Ravago's sale strategies and pricing methodologies are within Ravago Confidential Information. Ravago's sales strategies and pricing methodologies include Ravago's competitive research and strategies for market differentiation, product implementation, deployment strategy,

and price lists. This information is protected within Ravago and is not available to all employees. Ward had access to Ravago's sales strategies and pricing methodologies.

91.    Ravago employs investment bankers to research and monitor the markets in which it conducts business to be used in its procurement and sales strategies deployed globally. Work product generated by these investment bankers is treated as confidential and not shared publicly. Ward had access to this information during his Ravago employment.

92.    Ravago treats its customers' information as confidential information. Only a select group of employees have access to customer information. At the time of his resignation, Ward had access to all of the information for Muehlstein customers.

**Ravago Trade Secrets**

93.    During his employment with Ravago, Ward had access to "the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning [Ravago's] products and services" ("Ravago Trade Secrets"). Ward agreed that these items are trade secrets belonging to Ravago.

94.    Ward agreed not to disclose the Ravago Trade Secrets.

*Customized Facilities and Operations*

95.    Ravago has built specialized facilities that contain customized systems and operations that improve the efficiency of its warehousing, transloading, blending, debagging, and bagging operations and that give Ravago a competitive advantage ("Ravago Systems").

96.    Ravago owns the Ravago Systems, which it developed.

97.    For example, Ravago's Baytown location is a specialized facility that contains Ravago Systems.

98.    Ward has visited the Baytown location and knows the details of the Ravago Systems.

99.   For example, to get into the Ravago Baytown facility, whether or not employed by Ravago, everyone is required to sign a non-disclosure agreement and photographs are not allowed.

100.   Vinmar has built a facility right next to Ravago's Baytown facility.

101.   A true and correct aerial photograph showing the proximity of these two facilities is attached hereto and incorporated herein as Exhibit D.

### *Ravago Customer Lists*

102.   In addition to customer information maintained in its software, Ravago divisions keep customer lists on Excel spreadsheets to use in day-to-day business.

103.   Ward, from his work in the Muehlstein division, had access to those customer lists and he would have had copies of the lists on his Ravago-issued computer. Upon information and belief, Ward retained copies of those lists on the hard drive that he removed from his Ravago-issued computer. Ward has access to that information and has not returned it to Ravago.

104.   The customer lists are compilations that derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, a competitor. For example, if a competitor had Ravago's customer list, it could solicit customers easily in a market where customers are not readily identifiable by having access to purchasing history, forecasted volumes, and knowledge and contact information for procurement decision makers.

**Ravago Takes Reasonable Measures to Protect Ravago Confidential Information and Ravago Trade Secrets**

105.   Ravago employs physical protection at its work sites, including facility access controls.

106.   Entry to Ravago's offices and facilities is limited to authorized-personnel only.

107.   Ravago does not allow any non-employee to access its computer systems.

108.   Ravago requires employees to change computer access passwords every four months.

{02757991 - 1}                                      16

109.    Employee access to information stored on Ravago's computer servers is limited by the job duties assigned to the particular employee.

110.    Ravago employees are issued a company computer, hard drive, and cellphone, each of which must be returned upon the employees' departure from the company.

111.    As a condition of employment and the use of the above stated company technology, all employees are bound by the Employee Handbook, which prohibits the disclosure, deletion, or destruction of any files or data from Ravago-issued devices.

112.    Ravago has employees sign Non-Disclosure Agreements. Ward's Agreement includes non-disclosure obligations.

113.    After resigning from Ravago, Ward remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

114.    Ravago employees (other than information technology professionals) do not have access to the Wi-Fi network password and cannot connect devices to the Ravago network at its offices.

**Ward Misappropriates Ravago Confidential Information and Ravago Trade Secrets**

115.    During his employment, Ward was issued (a) a Dell Venue computer installed with a LiteOn brand hard drive and (b) a mobile phone.

116.    Before returning his Ravago-issued technology to the company, Ward removed the original LiteOn hard drive ("Original Hard Drive") installed in his Ravago-issued Dell computer, and replacing it with a single SanDisk 128 GB M.2 SSD hard drive ("Replacement Hard Drive").

117.    The unique identifier of the Original Hard Drive installed in Ward's Ravago-issued Dell computer was Dell part number Y48CM.

118.    The serial number of the Replacement Hard Drive installed in the Ravago-issued Dell computer that Ward returned was 134426407073.

{02757991 - 1}                                        17

119.    The Replacement Hard Drive installed in Ward's Ravago-issued Dell computer was wiped completely clean, lacking even an operating system, which rendered the computer functionally unusable.

120.    A declaration of John Jorgensen, President, CEO, and senior forensic analyst of The Sylint Group, Inc., is attached hereto and incorporated herein as Exhibit E.

121.    Upon information and belief, Ward retained—and has in his possession, custody or control—the Original Hard Drive from his Ravago-issued Dell computer, which contains a full backup of his Ravago computer.

122.    Unless Ward destroyed the files, the Original Hard Drive contains all of the files that were housed on the Ravago-issued computer, including Ravago Confidential Information, Ravago Trade Secrets, and Ward's Ravago work product, which Ravago rightfully owns.

123.    Ward's actions in removing and retaining the Original Hard Drive from his Ravago-issued computer and replacing it with the unusable Replacement Hard Drive are in direct violation of Ravago's Employee Handbook and his Agreement.

**Threatened Continued Misappropriation**

124.    Ward is now a director with VPA.

125.    VPA is in the business of competing with Ravago.

126.    After resigning from Ravago, Ward remains subject to a duty not to use Ravago Confidential Information or Ravago Trade Secrets, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

127.    Because Ward continues to have access to Ravago Confidential Information, it is inevitable that Ward will use that information to Ravago's harm.

128.    Because Ward continues to have access to Ravago Confidential Information, there is a real threat of continued or future misappropriation by Ward of Ravago's confidential information.

129.    Because Ward continues to have access to Ravago Trade Secrets, it is inevitable that Ward will use that information to Ravago's harm.

130.    Because Ward continues to have access to Ravago Trade Secrets, there is a real threat of continued or future misappropriation by Ward of Ravago's trade secrets.

**Ravago Suffers Irreparable Harm**

131.    Upon information and belief, Ward used and continues to use Ravago Confidential Information to assist VPA in directly competing with Ravago.

132.    Upon information and belief, Ward used and continues to use Ravago Trade Secrets to assist VPA in directly competing with Ravago.

133.    Ravago is the owner of the Ravago Confidential Information.

134.    Ravago is the owner of the Ravago Trade Secrets.

135.    The Ravago Confidential Information is valuable to a competitor because it would enable the business to copy such models, methods, and strategies to compete directly with Ravago. This would give the competitor an advantage. VPA is a competitor.

136.    The Ravago customer lists would be highly valuable to a competitor because they would enable the business to contact new customers, that might not otherwise be known, and solicit the most valuable customers first.

137.    The Ravago pricing information would be highly valuable to a competitor because it would enable such competitor to use pricing information, that might not otherwise be known, to undercut Ravago's pricing offers to its customers and take higher margin business first.

138.  Premier Polymers ("Premier") is an affiliate of VPA. VPA or Premier used Ravago Confidential Information to solicit Ravago's customers it did not have previous relationships with and attempted to steal the business using knowledge of Ravago's pricing information unless Ravago cut its prices to its customers.

139.  The Ravago Systems are a Ravago Trade Secret. The Ravago Systems derive independent economic value from not being generally known to competitors because it represents a significant investment by Ravago of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Systems would be highly valuable to a competitor because it would enable the business to compete by increasing efficiency, reducing profit margins, and provide additional services to suppliers and customers because of better logistics provided to suppliers and customers. Ravago invested considerable time and money into developing the Ravago Systems. If a competitor would be able to use the Ravago Systems without the investment of the time and money to independently create it, the competitor would be enriched unjustly and able to compete unfairly against Ravago.

140.  As Ward continues to use Ravago's information to directly solicit customers and to lure employees, his conduct is having an immediate and detrimental effect on Ravago. In particular, Ravago has incurred investigation and hiring costs, has had to alter its compensation structures, expend time and energy to keep employees who are being solicited, has had to reduce its prices to keep customers and not lose business to VPA and Premier Polymers, and has had to implement other protective means that will be more fully developed during discovery and as the case is ongoing.

141.  Ravago does not have access to the information solely in Ward's possession or custody, or under his control regarding how Ward has used Ravago Confidential Information and Ravago

Trade Secrets to benefit himself or VPA or Vinmar. Upon information and belief, Ward has disclosed Ravago Confidential Information and Ravago Trade secrets to VPA and to Vinmar, who are using that information (including information about the best employees to solicit away from Ravago) to compete with Ravago. Ward is being personally compensated and is benefitting directly from his misuse of the Ravago Confidential Information and the Ravago Trade Secrets.

**Ward Breaches his Agreement by Soliciting Employees**

142.    Ravago's September 2018 telephone records show that Ward, directly or indirectly, contacted several Ravago employees for the purposes of soliciting them for employment with Vinmar or VPA.

143.    Upon information and belief, based on information obtained directly from Ward, Cassel, the Vinmar Director, directly contacted Ravago employees in an attempt to solicit Ravago's employees to work with Ward at VPA.

144.    Attached hereto and incorporated herein as Exhibit F is a true and correct screenshot of a LinkedIn communication that Cassel had with a Ravago employee, soliciting him and then sending him a large gift from Texas.

145.    Vinmar recently has offered at least three Ravago employees employment at VPA. Upon information and belief, Vinmar obtained the information to recruit these employees directly from Ward.

146.    As recently as November 23, 2018, VPA, directly or through Vinmar, continues to solicit key Ravago employees, using Peretz to recruit from Canada for United States positions.

147.    Upon information and belief, the Vinmar Group has not made similar targeted attempts to poach employees from other competitors at any point in recent time.

**Ward Breaches His Agreement by Soliciting Customers**

148.    Ward's Agreement prohibits him from directly or indirectly soliciting Ravago customers.

149.     Ward has either directly or indirectly contacted Ravago's customers through improper use of Ravago's customer lists and information obtained during his employment with Ravago.

150.     Upon information and belief, Ward provided Ravago's confidential customer pricing and volume commitment information to others within Vinmar, who attempted to undercut Ravago's proposed pricing and secure the customers' business, in particular, VPA's affiliate, Premier. Premier would not have had access to that information but for Ward providing it to them.

**Prior Litigation**

151.     On September 24, 2018, Ravago sued Ward for these violations, along with other defendants, in the United States District Court for the Middle District of Florida ("First Action").

152.     Ward moved to dismiss the claims there for lack of personal jurisdiction on the grounds that he was an Ohio citizen.

153.     Ravago previously moved for injunctive relief in the First Action, and at the time of filing this Complaint, the motion had not been decided due to claims for lack of personal jurisdiction.

154.     Ravago has acted swiftly and consistently to protect its interests in this matter.

155.     To avoid concerns surrounding any jurisdictional issues in the First Action and to address Ward's jurisdictional objection (saying that Ohio is the proper forum), Ravago brings this action solely against Ward in this district.

**CAUSES OF ACTION**

**COUNT I**
**BREACH OF CONTRACT – CONFIDENTIAL INFORMATION**

156.     Ravago incorporates paragraphs 1 – 155 above as if fully restated herein.

157.     The Agreement, as detailed in Paragraphs 43 to 58 above and incorporated herein, restricts Ward from using or disclosing Ravago Confidential Information.

158.   Ward breached, and continues to breach, the Agreement by using and/or disclosing Ravago Confidential Information.

159.   In the Agreement, Ward agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement. This is because money damages will be ineffective alone to remedy his breaches.

160.   Ward agreed as follows:

> The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

161.   As a proximate result of Ward's conduct, Ravago is likely to suffer irreparable injury in the absence of preliminary relief because of the loss of its exclusive use of the Ravago Confidential Information.

162.   An injunction will not harm Ward because he agreed not to use Ravago's Confidential Information and Ward has no reason to use Ravago's Confidential Information. Ward also does not need to use Ravago's Confidential Information to compete fairly.

163.   A preliminary and permanent injunction preventing Ward from using Ravago Confidential Information is in the public interest.

164.   Ravago is entitled to a preliminary injunction preventing Ward from using Ravago Confidential Information.

165.   Ravago is entitled to a permanent injunction preventing Ward from using Ravago Confidential Information.

166.    In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

167.    Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

168.    Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Ward's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT II
## BREACH OF CONTRACT – TRADE SECRETS

169.    Ravago incorporates paragraphs 1 – 155 above as if fully restated herein.

170.    The Agreement, as detailed in Paragraphs 43 to 58 above and incorporated herein, restricts Ward from using or disclosing Ravago Trade Secrets.

171.    Ward breached, and continues to breach, the Agreement by using and/or disclosing Ravago Trade Secrets.

172.    In the Agreement, Ward agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

173.    Ward agreed as follows:

> The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

174.   As a proximate result of Ward's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of its exclusive use of the Ravago Trade Secrets.

175.   Ward will not be injured by an injunction because he agreed not to use the Ravago Trade Secrets and Ward has no reason to use Ravago Trade Secrets.

176.   An injunction preventing Ward from using Ravago Trade Secrets is in the public interest.

177.   Ravago is entitled to a preliminary injunction preventing Ward from using Ravago Trade Secrets.

178.   Ravago is entitled to a permanent injunction preventing Ward from using Ravago Trade Secrets.

179.   In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

180.   Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

181.   Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Ward's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT – FAILURE TO RETURN PROPERTY

182.    Ravago incorporates paragraphs 1 – 55 above as if fully restated herein.

183.    The Agreement, as detailed in Paragraphs 43 to 59 above and incorporated herein, requires Ward to deliver all of his documents and computer files to Ravago at the conclusion of his employment.

184.    Ward breached the Agreement by removing the Original Hard Drive from his company-issued computer, which housed files that were the property of Ravago.

185.    Ward breached the Agreement by retaining the Original Hard Drive and copies of files from his Ravago computer following his resignation from Ravago.

186.    In the Agreement, Ward agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

187.    Ward agreed as follows:

> The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

188.    As a proximate result of Ward's conduct in retaining the Original Hard Drive from his Ravago computer, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of its exclusive use of the Ravago Confidential Information, Ravago Trade Secrets, and any other business information Ward took.

189.    Ward will not be injured by an injunction requiring him to return Ravago's information because he agreed to return the Ravago-issued technology, including all files and information, and Ward has no legitimate claim to retain the hard drive or the information contained thereon.

190.    A preliminary and permanent injunction requiring Ward to return the Original Hard Drive containing all files and information from his Ravago-issued computer is justified as specific performance of the terms of the Agreement.

191.    In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

192.    Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

193.    Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Ward's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT – EMPLOYEE SOLICITATION

194.    Ravago incorporates Paragraphs 1 – 55 above as if fully restated herein.

195.    The Agreement, as detailed in Paragraphs 43 to 62 above and incorporated herein, prohibits Ward from soliciting, directly or indirectly, Ravago employees.

196.    Ward breached, and is continuing to breach, this section of the agreement by directly and indirectly recruiting and attempting to recruit current Ravago employees.

197.    In the Agreement, Ward agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

198.    Ward agreed as follows:

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this

> Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

199.    As a proximate result of Ward's conduct in soliciting, directly or indirectly, Ravago's employees, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of employee knowledge, training, and customer relationships.

200.    Ward will not be injured by an injunction because he agreed not to solicit, directly or indirectly, Ravago's employees, and Ward has no legitimate reason to seek to poach Ravago employees in violation of his Agreement.

201.    A preliminary and permanent injunction requiring Ward to return the files and information from his Ravago-issued computer is justified as specific performance of the terms of the Agreement.

202.    In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

203.    Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

204.    Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Ward's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT V
## BREACH OF CONTRACT – CUSTOMER SOLICITATION

205.    Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

206.    The Agreement, as detailed in Paragraphs 43 to 61 above and incorporated herein, prohibits Ward from soliciting, directly or indirectly, Ravago customers.

207.    Ward breached, and is continuing to breach, this section of the Agreement by directly and indirectly soliciting Ravago customers.

208.    In the Agreement, Ward agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

209.    Ward agreed as follows:

>    The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

210.    As a proximate result of Ward's conduct in soliciting, directly or indirectly, Ravago's customers, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of the customer, its ongoing revenue and potential to expand business.

211.    Ward will not be harmed by an injunction because he agreed not to solicit, directly or indirectly, Ravago's customers, and Ward has no legitimate right to do so.

212.    A preliminary and permanent injunction requiring Ward to return the files and information from his Ravago-issued computer is justified as specific performance of the terms of the Agreement.

213.    In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

214.    Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

215.    Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Ward's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

216.    Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

217.    Ward owed a fiduciary duty to Ravago. This duty includes without limitation, duties of good faith, care, and loyalty.

218.    By virtue of the conduct and acts described herein, Ward breached the fiduciary duties owed to Ravago.

219.    As a result of Ward's conduct and actions as described throughout this Complaint, Ravago has been damaged in an amount to be determined at trial.

220.    Ward's actions were willful and in reckless disregard of Ravago's rights and interests, entitling Ravago to punitive damages in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF THE DEFEND TRADE SECRETS ACT

221.    Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

222.    This is an action for injunctive relief and damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA").

223.    Ravago owns and possesses the Ravago Trade Secrets.

224.    Ravago's business operates in interstate commerce and it uses the Ravago Trade Secrets in interstate commerce.

225.    The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

226.    The Ravago Trade Secrets are trade secrets under the DTSA because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in 18 U.S.C. § 1839(3).

227.    As set forth herein, Ravago takes reasonable measures to keep the Ravago Trade Secrets secret.

228.    The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

229.    Ward acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

230.    Ravago did not give permission to Ward to take the Ravago Trade Secrets when he left Ravago.

231.    Ward took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA and for a larger salary at VPA.

232.    Ward willfully and maliciously misappropriated the Ravago Trade Secrets and continues to have them to this day.

233.    As a result of Ward's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm. Ravago may lose customers and suppliers to competitors and lose competitiveness in the marketplace that it cannot recover. Without immediate and permanent

injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

234. As a result of Ward's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for the prior actions, which if not enjoined will be difficult if not impossible to measure, including loss of profits that would have been earned but for his actions. Ravago is thus entitled to preliminary and permanent injunctive relief to stop any further harm to its business, which cannot reasonably be measured, as well as to recover any monetary damages for actions taken prior to injunctive relief being granted.

235. Ward's conduct has been willful, entitling Ravago to exemplary damages under the DTSA.

## COUNT VIII
## THREATENED MISAPPROPRIATION UNDER THE DTSA

236. Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

237. Under the DTSA, the Court may grant an injunction "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A).

238. In addition, the Court may require "affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(ii).

239. Unless enjoined, Ward threatens to continue to use or disclose the Ravago Trade Secrets.

240. As a proximate result of Ward's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

241. Ward will not be harmed by an injunction because he agreed not to use the Ravago Trade Secrets and Ward has no reason to use Ravago Trade Secrets.

242. An injunction preventing Ward from using Ravago Trade Secrets is in the public interest.

243. Ravago is entitled to a preliminary injunction preventing Ward from using or threatening further disclosure of Ravago Trade Secrets.

244. Ravago is entitled to a permanent injunction preventing Ward from using Ravago Trade Secrets.

## COUNT IX
## VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT

245. Ravago incorporates paragraphs 1 – 155 above as if fully restated herein.

246. This is an action for injunctive relief and damages under the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes ("FUTSA").

247. Ravago owns and possesses the Ravago Trade Secrets.

248. Ravago's headquarters are in Florida, and were in Florida during Ward's employment. Since 2006, Ward's compensation for his work for Ravago was paid to him from Florida.

249. Ravago's business operates in interstate commerce, directed from its headquarters in Florida.

250. After resigning from Ravago, Ward remains subject to a duty not to use trade secrets that he acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

251. The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

252. The Ravago Trade Secrets are trade secrets under the FUTSA because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in Fla. Stat. § 688.002(4).

253.     As set forth herein, Ravago takes reasonable efforts under the circumstances to keep the Ravago Trade Secrets secret.

254.     The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

255.     Ward acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

256.     Ravago did not give permission to Ward to take the Ravago Trade Secrets when he left.

257.     Ward took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA and for a larger salary at VPA.

258.     Ward willfully and maliciously misappropriated the Ravago Trade Secrets and continues to have them to this day.

259.     As a result of Ward's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm due to its reputation and good will among its customers and suppliers. Ravago may lose customers and suppliers to competitors that it cannot recover. Without immediate and permanent injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

260.     As a result of Ward's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for the prior actions, which if not enjoined will be difficult if not impossible to measure, including loss of profits that would have been earned but for his actions. Ravago is thus entitled to preliminary and permanent injunctive relief to stop any further harm to its business, which cannot reasonably be measured, as well as to recover any monetary damages for actions taken prior to injunctive relief being granted.

261.   Ward's conduct has been willful, entitling Ravago to exemplary damages under the FUTSA.

## COUNT X
## THREATENED MISAPPROPRIATION UNDER THE FUTSA

262.   Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

263.   Under the FUTSA, "[a]ctual or threatened misappropriation may be enjoined". § 688.003(1), Fla. Stat.

264.   Unless enjoined, Ward threatens to continue to use or disclose the Ravago Trade Secrets.

265.   As a proximate result of Ward's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

266.   Ward will not be harmed by an injunction because he agreed not to use the Ravago Trade Secrets, and Ward has no reason to use Ravago Trade Secrets.

267.   An injunction preventing Ward from using Ravago Trade Secrets is in the public interest.

268.   Ravago is entitled to a preliminary injunction preventing Ward from using Ravago Trade Secrets.

269.   Ravago is entitled to a permanent injunction preventing Ward from using Ravago Trade Secrets.

## COUNT XI
## <u>COMPUTER FRAUD AND ABUSE ACT</u>

270.    Ravago incorporates Paragraphs 1 – 155 above as if fully restated herein.

271.    This is an action for damages and injunctive relief under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").

272.    Ravago provides each of its employees access to a computer and computer network for purposes of fulfilling the employee's duties to Ravago.

273.    Ravago's Employee Handbook directs that all computers issued to Ravago employees must be returned upon their departure from the company.

274.    The Employee Handbook further requires that the computer be returned in the condition in which it was maintained by the employee during his or her employment.

275.    Upon information and belief, Ward intentionally removed the Original Hard Drive from his Ravago-issued computer, and retained the Original Hard Drive containing all of the files from his computer with the intent to injure Ravago.

276.    Ward intentionally replaced the Original Hard Drive with a functionally unusable Replacement Hard Drive, depriving Ravago of all of Ward's work information that belonged to Ravago.

277.    Ravago did not authorize Ward to remove the Original Hard Drive from his Ravago-issued computer, and replace it with the Replacement Hard Drive.

278.    By retaining the Original Hard Drive from his Ravago-issued computer, Ward obtained a substantial amount information from Ravago, including Ravago Confidential Information and Trade Secrets.

279.    Ravago has been damaged in excess of $5,000.00 as a result of Ward's unauthorized access to its computer, and has incurred attorney's fees in bringing this claim.

## PRAYER FOR RELIEF

Based on the foregoing, Ravago prays for the following relief:

1.      Specific Performance by Ward of all obligations under the Agreement.

2.      Preliminary injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from using Ravago Confidential Information, including its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, so long as that information remains Confidential under the Agreement.

3.      Permanent injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from using Ravago Confidential Information, including its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, so long as that information remains Confidential under the Agreement.

4.      Preliminary injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from using Ravago Trade Secrets, including the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Ravago's products and services.

5.      Preliminary and permanent injunctive relief requiring Ward to return the Original Hard Drive and all copies of any information from that hard drive.

6.      Preliminary injunctive relief to prevent Ward's threatened misappropriation under the DTSA, including restricting Ward's activities with VPA and its related entities to prevent disclosures of the information.

7.      Permanent injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from using Ravago Trade Secrets,

{02757991 - 1}                                      37

including the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Ravago's products and services.

8.      Preliminary injunctive relief to prevent Ward's threatened misappropriation under the FUTSA, including restricting Ward's activities with VPA and its related entities to prevent disclosures of the information.

9.      Preliminary and permanent injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from soliciting Ravago employees for eighteen months from the date of the injunction or such other period as the Court determines to be acceptable.

10.     Preliminary and permanent injunctive relief preventing Ward, his agents, employees, attorneys, and other persons who are in active concert or participation with Ward, from soliciting Ravago customers for eighteen months from the date of the injunction or such other period as the Court determines to be acceptable, including enforcement of the tolling provision in the Agreement.

11.     Judgment in favor of Ravago against Ward, awarding all available relief, including compensatory and exemplary damages in an amount to be determined at trial, under the DTSA, as may be appropriate.

12.     Judgment in favor of Ravago against Ward, awarding all available relief, including compensatory and exemplary damages and attorney's fees in an amount to be determined at trial, under the FUTSA, as may be appropriate.

13.     Judgment in favor of Ravago against Ward for breach of contract for violating Sections 3, 4, 6, 7, and 8, jointly and severally, of the Agreement, including costs and attorney's fees, in an amount to be determined at trial.

14.     Judgment in favor of Ravago against Ward, awarding all available relief, including compensatory and exemplary damages and attorney's fees in an amount to be determined at trial, under the CFAA, as may be appropriate.

15.     For trial by jury for all claims so triable.

16.     For all other relief as the Court may find just and proper.

Respectfully submitted,

*/s/ Ralph E. Cascarilla*
**Ralph Cascarilla (Reg. No. 0013526)**
rcascarilla@walterhav.com
WALTER HAVERFIELD LLP
1301 E 9th Street, Suite 3500
Cleveland, OH 44114-1821
Telephone No. 216-928-2908
Facsimile No. 216-916-2346

**Oliver Benton Curtis III**
*to be admitted pro hac vice*
ben.curtis@nelsonmullins.com
NELSON MULLINS BROAD AND CASSEL
2 South Biscayne Blvd., # 2100
Miami, FL 33131
Telephone No. 305-373-9464
Facsimile No. 305-373-9443

**Erika Birg**
*to be admitted pro hac vice*
erika.birg@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th St. NW, Suite 1700
Atlanta, GA 30363
Telephone No. 404-322-6110
Facsimile No. 404-322-6404